IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER


MICHAEL EL-ZABET,                    )

          Plaintiff            )

       v.                             )                    No.  4:04-cv-59

NISSAN NORTH AMERICA, INC.,          )

         Defendant           )


**MEMORANDUM OPINION**


       This is an employment discrimination action brought pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and

the Tennessee Human Rights Act, T.C.A. § 4-21-401, *et seq.*  Plaintiff claims that

he was harassed and discriminated against during his years of employment at

Nissan North America, Inc. (Nissan), as well as terminated from his employment in

retaliation for his complaints about this discrimination.   Currently pending is

defendant's motion for summary judgment [Court File #4].  For the reasons that

follow, the motion will be granted and this action dismissed.

I.

**Factual Background**

The following factual allegations are considered in the light most favorable to the plaintiff.

Plaintiff Michael El-Zabet is of Middle Eastern origin. He was born in Jordan and moved to the United States around the end of 1983. He became a citizen of the United States in 1988. He defines his race as Arabic.

Plaintiff was hired by defendant Nissan at its Smyrna, Tennessee plant as a technician in May, 1997. Plaintiff now complains that while he worked at the Smyrna plant he suffered harassment in the form of demeaning comments from co-workers calling him names such as "camel jockey" and "sand nigger." Plaintiff does not identify the employees who called him these names, nor is he able to accurately identify supervisors whom he claims heard and laughed at this name-calling.

At the time of his hiring, plaintiff received a copy of Nissan's employee handbook. Nissan discussed the policies within that handbook with plaintiff and other new employees around the time of his hiring. The handbook contained a policy prohibiting discrimination and discussing the procedure for an employee to

2

follow if they felt that they were being subjected to discrimination or harassment. Nissan discussed those anti-discrimination and reporting policies with plaintiff and other new employees. However, plaintiff did not raise with the defendant his claims that employees at the Smyrna factory had used different types of slurs in his presence until 2003, long after plaintiff had left the Smyrna facility.

Attached to plaintiff's complaint are five job applications which he submitted for various jobs at the Smyrna facility while he was there. Plaintiff was not promoted to any of these jobs and in the rejection letters for each job he was told either that he did not have the minimum qualifications for the job or that someone with greater qualifications was hired. There is no evidence in the record to indicate who was hired for these jobs or what their qualifications were, nor is there any indication of their race, gender, age, or national origin. Plaintiff has not come forward with any evidence to indicate that he was better qualified for any of these positions than the person hired.

In his deposition, plaintiff testified that he believed he did not receive the various jobs for which he applied at the Smyrna factory because he was told that an individual named Jennifer Woodside in Human Resources was "prejudiced." Plaintiff was told this by "Mike" and "Lynn." According to the plaintiff, Ms. Woodside's "prejudice" stemmed from the fact that she would make hiring decisions "based on

3

who you are related to or who you know." Plaintiff was not the only one who did not receive a job based on Ms. Woodside's preference for hiring family or friends, as he testified that there were "white individuals who felt that they were improperly denied jobs by Jennifer." Plaintiff admits that individuals were only rarely promoted from hourly technical jobs to salaried exempt jobs.

While plaintiff was employed at the Smyrna factory he applied for a Quality Technologist position in Nissan's Decherd facility. This position was a salaried exempt position. Bryan Donath interviewed the plaintiff for this position and offered him the job. Plaintiff's receipt of the Quality Technologist job was a promotion and plaintiff received a raise from the "low $20s" to a salary of $42,000 per year.

Plaintiff began working as a Quality Technologist at the Decherd facility on April 2, 2001. As a Quality Technologist, plaintiff was responsible for assembly lines, parts issues, dealing with suppliers, computer paperwork, e-mails, shipping, dealing with customers, and dealing with suppliers. It was plaintiff's responsibility to insure that the quality of the parts that went into car engines and axles were in good condition. Plaintiff was also responsible for writing the procedure manuals for DMIS individuals and as such it was important for him to have good writing and communications skills. Plaintiff also had to take digital photos of faulty parts, so that the photos could be e-mailed to a supplier to allow that supplier to determine what

4

was causing the problem.  Plaintiff also had responsibilities with regard to shipping parts to Japanese suppliers.

Plaintiff claims that when he first arrived in his new department in Decherd, morale was not good and employees in the department would not talk to one another.  When plaintiff first started working at the Decherd facility, he was working in a job that dealt with scrap parts.  Plaintiff claims that Mr. Donath would call him "scrap bitch," referring to where plaintiff was working.  Mr. Donath also allegedly called plaintiff a "delivery boy."  Plaintiff was not sure whether Donath was joking or whether he intended some type of insult or slur.

Plaintiff was not the only one who Mr. Donath gave a name.  According to plaintiff's testimony, Mr. Donath had a name for everybody.  Mr. Donath called other employees "bitch," including white employees.  Mr. Donath anointed other white, non-Middle Eastern employees with names such as "coffee bitch," "computer bitch," and "copy bitch."  Mr. Donath also called another white employee "pumpkin head" because of the size of his head.  Plaintiff agrees that Mr. Donath gave other employees besides him a hard time.

Plaintiff also claimed that Mr. Donath called him a "terrorist" in an e-mail sent on May 28, 2001.  The e-mail appeared to be an attempt at humor made by Mr.

Donath over a crisis in the department regarding "Eagle Picher oil pumps." This e-mail was entitled "Top Ten Things Heard During Eagle Picher Oil Pump Crisis." Number seven on the list was as follows:

> Tullahoma police car #10 to Central radio: "Calling all cars, calling all cars. Be on the lookout for a 99 Mercury Villager, with dealer plates, possible Arab terrorist making loops around Sonic and Tullahoma movie theater for last two hours, maybe has fertilizer bomb inside." (As Michael did stop-and-go driving in order to stress high clutch pack).

Plaintiff claims that on another occasion Mr. Donath had a conversation with him about tension between the Palestinians and Israelis. Plaintiff presumed this to be some type of slight against him for being of Middle Eastern origin. On September 11, 2001, Mr. Donath made a comment to which plaintiff took offense. Mr. Donath asked plaintiff what he thought about the events of September 11, and then Donath stated, "I think we ought to nuke all those people in the Middle East."

At the time that Mr. Donath made these allegedly disparaging comments to plaintiff, plaintiff did not report them to anyone in Nissan's Human Resources Department. However, he would eventually report the comments in 2003. Plaintiff testified that he did not report the comments at the time because he was "new in the department" and he was not there to "start trouble." When plaintiff finally did report these comments in April 2003, he had a meeting with Mark Stout of Nissan's Human

6

Relations Department to discuss Mr. Donath's statements. Plaintiff did not inform Mr. Stout of Mr. Donath's e-mail until he had another meeting with Mr. Stout in July 2003. At the time of these meetings, Mr. Donath was no longer working for Nissan and in fact had been gone for over a year, as Mr. Donath's employment at the Decherd facility had ended on March 7, 2002.

While Mr. Donath was still at Nissan and plaintiff was working under him, Mr. Donath had given him a number of performance reviews. These reviews reflected that plaintiff needed to make improvement in a wide variety of areas. At his deposition, plaintiff could not say whether Mr. Donath gave plaintiff low evaluations because of his Jordanian national origin. Instead, plaintiff thinks it "was just out of hatred" and he intended "to get back at me for something."

Plaintiff's next supervisor after Mr. Donath was Enrique Hernandez. Mr. Hernandez informed plaintiff that, because of his past performance evaluations, people within Nissan were monitoring his work and performance. He further told plaintiff that because people were looking to plaintiff to improve his performance, he wanted him to prove to those people that he could do a good job. Plaintiff received two evaluations from Mr. Hernandez. Plaintiff claims that Mr. Hernandez told him that because Mr. Donath had previously given plaintiff poor evaluations, "I'm not going to be able to give you a good evaluation right away." Mr. Hernandez told

7

plaintiff that he needed to give him lower evaluation scores because he could not raise his scores too high or too fast from what Mr. Donath had given him.

Mr. Hernandez placed plaintiff on a Performance Improvement Plan. In that plan, plaintiff was informed that he needed to improve in the areas of written communication, engine and transaxle knowledge, drawing specifications, and rework and sorting procedures. Plaintiff believes that Mr. Hernandez was scared of his supervisor, Tom Boswell, and that it was because of this fear that he did not give him a good evaluation. Plaintiff does not believe that Mr. Hernandez subjected him to any type of discrimination.

After Mr. Hernandez left the department, Larry Worsham became plaintiff's supervisor. Plaintiff believed that he was not getting his performance evaluation in a timely fashion from Mr. Worsham. Plaintiff told Mr. Worsham that he thought he was being subjected to discrimination because he had not received his performance evaluation in a manner he considered timely. The day after he made this allegation to Mr. Worsham, representatives of the Human Resources Department conducted a meeting with plaintiff to discuss his concerns. This meeting occurred in April 2003. Mr. Hernandez, Mr. Worsham, and Edgar Kane of the Human Resources Department were at that meeting. During the meeting, plaintiff was told that his evaluation was taking more time because he was on a written

8

Performance Improvement Plan, and because of this, Nissan wanted to give plaintiff's evaluation extra attention in order to insure that it was accurate. After this meeting, plaintiff did indeed receive his performance evaluation. During this time frame, plaintiff was also placed on another Performance Improvement Plan. Plaintiff was told he needed to improve in the areas of job competency, quality of work, judgment, and co-worker/business relationships.

After being placed on this Performance Improvement Plan, plaintiff sent an e-mail to Mr. Worsham in response to Mr. Worsham's request that he have a meeting with plaintiff. The e-mail stated:

> I hope you will reconsider this meeting. I know exactly what you are going to talk about, you and your buddy Edgar [Kane]. I will not let you play with my emotions the way you like. You better think about what you are about to start twice. You are about to start the same cycle Bryan Donath started, and this time I will not put up with it. This time I will involve Don Gudittes, Emil Hassan, and Chuck Cooper and whatever it takes. If these guys are not going to solve this problem we will see. I advise you not to open a big door that will be hard to close. I will do every legal thing I can to solve this problem. You cannot pick on me any more. You need to find someone else to play your game.

After plaintiff sent this e-mail, Edgar Kane and Mark Stout of the Human Resources Department conducted a meeting with plaintiff. At the conclusion of the meeting, plaintiff was told to take a week of paid leave while Human Resources conducted an investigation into plaintiff's sending of this e-mail and the issues raised therein.

9

When plaintiff returned from his paid leave on July 22, 2003, Mr. Stout and Mr. Worsham conducted a meeting with plaintiff so as to follow up with him about the investigation that occurred as a result of the e-mail. Plaintiff was told that he was being brought back to work and that Nissan wanted him to report that evening. Mr. Stout also informed plaintiff that his investigation revealed that most of plaintiff's complaints about discrimination and harassment related to Mr. Donath. He also told plaintiff that e-mails such as the one Donath had sent him were not appropriate. However, since Mr. Donath was no longer with the company, the company could no longer address those issues with Mr. Donath. Mr. Stout also told the plaintiff that his performance appraisals and improvement plans, although plaintiff did not agree with them, did not have anything to do with his national origin. Mr. Stout said they were strictly related to his performance. Mr. Stout pointed out that if plaintiff had advised Human Resources of this alleged conduct contemporaneously with when it took place, Nissan could have addressed it in a timely fashion.

During this meeting, plaintiff was asked if he was willing to continue working for Nissan under his Performance Improvement Plan. Plaintiff was told that Nissan believed that he had performance issues, had made him aware of those issues, and had a plan in place to assist him with those issues to help him succeed. Plaintiff stated that he could not abide by the Performance Improvement Plan because he did not "want to be harassed" and subjected to mental abuse. By not

10

being "harassed," plaintiff referred to the fact that the management and human resources employees were conducting periodic meetings with him about his performance. Plaintiff refused to work under this Performance Improvement Plan unless his attorney could be present at the performance meetings. Defendant would not permit plaintiff to work under the condition that his attorney would be present at all of these evaluation meetings.

Mr. Stout told plaintiff that his continued employment was conditioned upon his full cooperation in the Performance Improvement Plan. Plaintiff was further told that his failure to cooperate in the Performance Improvement Plan would mean that he had decided to no longer work at Nissan. Plaintiff stated that he fully understood his decision, but it was one that he must do. At that point, plaintiff was informed that his decision constituted a voluntary decision by him to end his employment. Accordingly, plaintiff's employment was considered by Nissan as voluntarily terminated on July 22, 2003.

II.

### *Summary Judgment Standards*

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions

11

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In assessing the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion. However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322.

12

III.

***Plaintiff's Section 1981 Claim***

The United States Court of Appeals for the Sixth Circuit has held that only claims of racial, as opposed to national origin, discrimination are cognizable under § 1981. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001). Plaintiff's complaint raises this § 1981 claim in count two, which states that he was the subject of "harassment and discrimination on the basis of national origin [in violation of] 42 U.S.C. § 1981." Thus, plaintiff's claim under § 1981 mentions only discrimination on the basis of national origin and therefore cannot be the basis for a claim under § 1981. The § 1981 claim must therefore be dismissed.

IV.

***Plaintiff's Claim Related to Harassment***
***While He Was Employed at the Smyrna Plant***

Prior to filing a lawsuit under Title VII, a plaintiff must file a charge of discrimination with the EEOC or equivalent state agency. *See Mitchell v. Chapman*, 343 F.3d 811, 819-20 (6th Cir. 2003). A plaintiff must file this charge of discrimination within 300 days of the alleged adverse employment action. *See* 42 U.S.C. § 2000e-5(e)(1). The timely filing of a charge of discrimination with the EEOC is a procedural prerequisite to the enforcement of a Title VII action in federal

13

court. Unlike Title VII, the THRA does not require plaintiff to file a charge of discrimination as a prerequisite to filing a THRA action. Instead, the statute of limitations for filing a THRA claim is one year. *Mason v. Metropolitan Development and Housing Agency*, 1999 WL 326177, *3 (Tenn. Ct. App. 825, 1999).

To the extent that plaintiff's claims relate to harassment he received during his employment at the Smyrna facility, plaintiff's claims under Title VII and the THRA are time-barred since plaintiff's employment at that facility came to an end on April 2, 2001. Plaintiff did not file the instant action until February 4, 2004, well over a year after his employment at the Smyrna facility came to an end.

Even if plaintiff's claims with regard to harassment at the Smyrna facility were not time-barred, they are nevertheless barred by plaintiff's failure to report the harassment to Nissan. "An employer is not liable for acts of racial harassment perpetrated by plaintiff's co-employees when 'the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and ... the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999). Plaintiff concedes that he did not report the use of slurs by co-workers at the Smyrna plant to anyone in Human

14

Resources in accordance with the reporting policies which he admittedly received and understood.

With respect to the failure to promote claims while plaintiff was at the Smyrna factory, those claims are similarly time-barred. In addition, even if those claims were not time-barred, defendant would nevertheless be entitled to summary judgment because plaintiff has presented no evidence that he did not receive a promotion at Smyrna because of his national origin. Nor has he provided any evidence that anyone not in a suspect classification received any of these jobs or was not more qualified than him. In addition, it is undisputed that plaintiff actually received a significant promotion while at the Smyrna plant, almost doubling his salary. Finally, based on plaintiff's own testimony, the reason he did not receive such promotions was due to a decision-maker "playing favorites" with family and friends and not because of any illegal animus.

V.

### *Plaintiff's Claims of Harassment*
### *While He Was Employed at the Decherd Facility*

All of plaintiff's claims of harassment at the Decherd plant were alleged to have been made by his first supervisor there, Mr. Donath. First, those claims are

15

time-barred under the applicable limitation periods of Title VII and the THRA since Mr. Donath's employment came to an end on March 7, 2002, and plaintiff filed his complaint more than one year after the end of Donath's employment. Plaintiff's claims with respect to Mr. Donath are also barred by plaintiff's failure to timely report the harassment to Nissan. Finally, for harassment to be actionable under Title VII, plaintiff must show "the conduct in question was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and that the victim subjectively regarded as abusive." *Smith v. Leggitt Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000). Such an environment can only be found to exist when "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Farmer v. Cleveland Public Power*, 295 F.3d 593, 605 (6th Cir. 2002). Mr. Donath's actions did not meet that standard. The alleged harassment consisted of: (1) the May 28, 2001 e-mail, (2) the conversation where he asked the plaintiff about his thoughts on the Palestine/Israeli conflict, (3) his September 11, 2001 comment that he thought "we need to nuke all those people in the Middle East," and (4) his reference to plaintiff as the "scrap bitch." These comments are not so severe that a reasonable person would find that they altered the conditions of their work environment. The comments were only sporadic at most. In fact, plaintiff claims that Mr. Donath usually ignored him. Moreover, plaintiff is unable to demonstrate that Mr. Donath's "harassment"

16

was because of plaintiff's Jordanian national origin.  In fact, it is undisputed that plaintiff was not the only employee who Mr. Donath treated poorly.  Rather, plaintiff's testimony made it clear that Mr. Donath treated all employees poorly, regardless of their national origin or race.  Accordingly, plaintiff is unable to demonstrate that he was mistreated by Mr. Donath because of his national origin or race.

VI.

***Plaintiff's Performance Evaluations***

Plaintiff contends that his performance evaluations and placement on Performance Improvement Plans was discrimination based upon his national origin or race.  However, plaintiff has come forward with no evidence upon which a reasonable jury could find that that was the case.  With respect to the reviews and Performance Improvement Plans given by Mr. Donath, plaintiff could not say in his deposition that he got those low scores and plans because of his Jordanian national origin.  Instead, plaintiff thinks it "was just out of hatred" and intended because Mr. Donath wanted "to get back at me for something."  Even if Mr. Donath gave plaintiff poor evaluations "out of hatred," that alone does not implicate Title VII.

With regard to the performance reviews and Performance Improvement Plans issued by  Mr. Hernandez, plaintiff specifically admitted that Mr. Hernandez

17

did not subject him to any type of discrimination. Instead, plaintiff testified that Mr. Hernandez gave him low scores because he was scared of his supervisor, Tom Boswell. Nor has plaintiff come forward with any evidence to show that Mr. Worsham placed plaintiff on a Performance Improvement Plan due to an anti-Jordanian or anti-Middle Eastern animus. Rather, those plans were consistent with those implemented by his predecessors, Mr. Donath and Mr. Hernandez.

VII.

**Plaintiff's Claim That He Was Terminated
in Violation of Title VII or the THRA**

In order to establish a *prima facie* case of discrimination under Title VII or the THRA, plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for his job and did it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. *Noble v. Brinker International, Inc.*, 391 F.3d 715, 734 (6th Cir. 2004).

In this case, plaintiff cannot show that he performed his job satisfactorily. Rather, he was placed by three separate supervisors on Performance Improvement

Plans, indicating that he had serious performance problems. Second, plaintiff cannot prove that he suffered an adverse employment action. Rather, when plaintiff returned from his paid leave on July 22, 2003, he was told that Nissan wished him to return to work that evening and that he could, if he was willing to continue to work for Nissan under a Performance Improvement Plan. Plaintiff refused to do so, at least without the attendance of his attorney at performance meetings. Nissan was reasonable in treating plaintiff's refusal to agree to participate in the Performance Improvement Plan as a voluntary decision by the plaintiff to end his employment with Nissan. Finally, plaintiff has come forward with no evidence that he was replaced by a person outside the protected class or that he was treated less favorably than a similarly situated individual outside the protected class. Plaintiff has not pointed to any employee who was afforded the right to have his attorney present when performance meetings were held.

## VIII.

### *Plaintiff's Retaliation Claim*

For plaintiff to state a *prima facie* case of retaliation, he must show that he engaged in some type of activity protected by statute, and that there is a causal connection between his engaging in the protected activity and the ending of his employment. *See Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 169 (6th

19

Cir. 2004). Plaintiff claims that he was fired because of the events of September 11 or because he insisted on having an attorney present when his performance meetings were held. Neither of these show that plaintiff engaged in any activity protected by statute. Nor has the plaintiff presented any evidence that there is a causal connection between his engaging in that protected activity and the termination of his employment. Accordingly, the defendant is entitled to summary judgment on both the Title VII and THRA claims.


## IX.

### *Plaintiff's Continuing Violation Theory*


Plaintiff contends that his harassment claims which occurred early on in his employment at the Smyrna plant and at the hands of Mr. Donath are not barred by the applicable statute of limitation because of the continuing violation doctrine. I conclude that that doctrine is not applicable here.


"Courts view continuing violations as falling within two categories of narrowly limited exceptions to the usual rule that statutes of limitations are triggered at the time the alleged discriminatory acts occurred." *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 857 (6th Cir. 2003). Those two narrow exceptions are: "Where the plaintiff can show prior discriminatory activity that continues into the

present, as opposed to prior discriminatory activity whose effects continue into the present and where the plaintiff can show a long-standing and demonstrable policy of discrimination." *Bell v. Ohio State Univ.*, 351 F.3d 240, 247-48 (6th Cir. 2003). "To establish a continuing violation, plaintiff must first produce evidence of a 'current' violation taking place within the limitations period. Second, plaintiff must show that the current violation ... is indicative of a pattern of similar discriminatory acts continuing from the period prior to the limitations period." *Weigel v. Baptist Hospital of East Tennessee*, 302 F.3d 367, 376-77 (6th Cir. 2002). "Thus, the current violation must be sufficiently similar or related to the time-barred acts, such that it can be said that the acts are all part of the same pattern of discrimination." *Id.* at 377. "The discriminatory conduct must be continuous or on-going." *Id.*

First, the court notes that the last instance of alleged harassment occurred outside the limitations period at the hands of Mr. Donath sometime before his employment came to an end on March 7, 2002. Second, the harassment alleged at the Smyrna facility is not "sufficiently similar or related to" any of the alleged harassment at the Decherd facility so as to show it was "part of the same pattern of discrimination." At the Smyrna factory, plaintiff claims that co-workers used derogatory racial slurs in his presence. Plaintiff does not allege that any such slurs were used in his presence at the Decherd facility. Third, the only alleged act that occurred within the applicable limitations period, the termination of plaintiff's

21

employment, is not sufficiently similar or related to any of the alleged harassment or discrimination that occurred outside of the limitations period.  Rather, the termination of plaintiff's employment at the Decherd plant in 2003 is a distinct and dissimilar event from plaintiff's allegation that he was harassed by Mr. Donath two years earlier and that he was harassed by co-workers at the Smyrna facility from 1997 to 2001.

## X.

### *Conclusion*

Based on the foregoing, the court concludes that all of plaintiff's claims of harassment under Title VII and the THRA are barred by the applicable statutes of limitations.  Even if they were not barred by the statutes of limitations, plaintiff fails to state an actionable harassment claim.   With respect to plaintiff's claims that adverse employment actions were taken against him on the basis of his national origin or race, those claims are either barred by the applicable statutes of limitations and/or fail to present a *prima facie* case of discrimination.  Accordingly, defendant's motion for summary judgment [Court File #4] will be granted and this action dismissed.

Order accordingly.

_____*s/  James H. Jarvis*_____
UNITED STATES DISTRICT JUDGE

22